IN THE

# SUPREME COURT

OF

# MINNESOTA.

---

## APRIL TERM, 1874.

---

THE ST. ANTHONY FALLS WATER POWER COMPANY

*vs.*

WILLIAM W. EASTMAN AND JOHN L. MERRIAM.

An agreement was entered into between the plaintiff of the first part, and the defendants of the second part, dated May 20th, 1867, containing among other things the following stipulations, "the parties of the first part concede to the parties of the second part, * * * * the right to draw from the Mississippi River, on the west side of the certain island in said river, at and above the Falls of St. Anthony, * * * commonly known as and called Nicollet Island, below the suspension bridge so called and in the deep water above the ledge of rocks in said river commonly called the 'Rips,' and to use on the said island, below the said bridge, in the manner and in accordance with the specifications, limitations, and

provisions, hereinafter contained, and not otherwise, a quantity of water sufficient to constitute a water power equal to two hundred (200) horse power, provided, and it is hereby expressly understood between the parties hereto, that such water or water power shall not, nor shall any part of it, ever be used for the sawing or manufacture of lumber from logs; * * * * and in order that said water may be made available to said parties of the second part, the said party of the first part doth hereby give and grant unto the said parties of the second part, their heirs and assigns, the right to construct, maintain and use, in the manner hereinafter provided, a tunnel from said Nicollet Island through the island below said Nicollet Island, commonly called Hennepin Island; all of the water so to be drawn as aforesaid shall be used and discharged through the said tunnel, which shall extend from the point on said Nicollet Island, where said water shall be used, to and through said Hennepin Island at the lower side of land leased by said party of the first part to Erb & Kassube, on which their grist mill is now situated.     *     *     *     *     *.

The said tunnel     *     *     is to be constructed in the sand stone strata under said Hennepin Island, and on such a level through its entire length as the agent of the said party of the first part may direct, but not so low as to prevent proper drainage; it shall be constructed at the expense of the said parties of the second part, and with all suitable precautions for its safety, and the safety of the property, rights and interests of the party of the first part; said parties of the second part shall have the right to bore or shaft down through said Hennepin Island to and into said tunnel for all necessary purposes of access and ventilation. And the said party of the first part hereby reserves to itself, its successors and assigns, the right at any time to use the said tunnel on or through said Hennepin Island for venting water through it, upon making such enlargement thereof as may be necessary to vent the additional water, which said party of the first part, its successors or assigns, may turn into it. And in case of such use by the party of the first part, its successors or assigns, they, the said party of the first part, its successors or assigns, shall bear and pay thereafter their just proportion of the expense of keeping said tunnel in repair below the highest point where the same shall be used by said party of the first part, its successors or assigns.     *     *     *."

*Held*, 1. That the stipulation, that the tunnel should be constructed "with all suitable precautions for its safety and the safety of the property, rights and interests of the plaintiff," was not an absolute guaranty by the defendants to the plaintiff against all injury that might occur to the property of the plaintiff by reason of the construction of the tunnel. 2.

The St. Anthony Falls Water Power Company v. Eastman et al.

The kind of tunnel to be constructed not being expressed in the contract, evidence as to the situation of the parties and existing circumstances at the time of making the agreement, among them, the fact that there was then and had been for some time in use at that place a system of tunnelling for hydraulic purposes, without lining, through the sand stone stratum, was admissible in order to determine whether the parties intended by their contract a tunnel in the sand rock without lining of masonry work. 3. The construction of the contract as to the kind of tunnel intended was a mixed question of law and fact; the question as to what facts were to be considered by the jury in arriving at the intention of the parties being one of law for the court, the existence of such facts being a question solely for the jury. 4. The words, "all suitable precautions," have reference to the kind of tunnel to be constructed, and mean all such suitable precautions as a discreet, prudent and cautious man, of ordinary capacity, would adopt in the construction of such a tunnel as the parties intended, were the risk all his own, under the facts and circumstances as then and there known and understood, and which, by the use of reasonable diligence, caution and skill, might have been known or anticipated; within this limitation, it was a question for the jury to determine what particular acts or measures of precaution were suitable and incumbent on the defendants for the safety of the tunnel, and the rights and property of the plaintiff. This refers to the jury the question as to the necessity for the employment of a civil engineer, the sufficiency of the engineering skill employed, the necessity for lining the tunnel or any portion of it with masonry work, together with all questions of a similar character.

The effect of this construction of the agreement is, that if the jury should find, as they may have done, that the tunnel intended by the contract was an unlined tunnel in the sandstone stratum, the omission to line the tunnel would not, of itself, in case of injury to the tunnel, be negligence; but in order to render the defendants liable for negligence, it must appear that the omission to line the tunnel was a neglect to use one of the suitable precautions required by the agreement within the rule above laid down.

The plaintiff requested the court to charge the jury that "the plaintiff had the right under the agreement to fix the grade on which the tunnel should be excavated for its entire length; and if the jury believe that the plaintiff did fix the grade at three inches to the hundred feet as the limit, and that the defendants disregarded said grade, and, for the purpose of excavating a softer stratum, rose a considerable number of feet from the

The St. Anthony Falls Water Power Company v. Eastman et al.

grade so fixed, and that such raise of grade was the cause of their meeting with the water, which they would not have met with had they kept in a harder stratum below, where plaintiff had fixed the grade, the defendants are liable on account of any damages which resulted from such change of grade by them." The court so charged, but at the same time directed the jury to consider the evidence and the terms of the contract in connection with the request so given; "that the plaintiff had no right to make the grade so nearly level as to prevent proper drainage, nor so as to cause water to flow back on the wheels; that the contract was to be considered as a whole, and they should consider the amount of water which might be used and vented under it, and the provisions in reference to water wheels and utilization of power." *Held*, that the instructions given in connection with the request were right.

Plaintiff by its charter is authorized "by vote of a majority of its stockholders to elect for a term of one or more years an agent or agents for the transaction of the business of said company, who shall reside within the territory and have such power and authority to transact the business of said company as the said company by vote as aforesaid shall delegate and authorize; and no agent, elected as aforesaid, shall enter upon the duties of his office or transact any business in behalf of or for the said company until the president and directors thereof shall make and execute a power of attorney in due form, and acknowledge the same before an officer empowered to take acknowledgments of deeds, which power of attorney shall clearly and specifically set forth what business, and to what extent the said agent or agents are authorized to transact business in behalf of said company, unless the power of attorney aforesaid be general, in which case the said company shall be bound by the acts of said agent to whatever extent the said agent assumes to act." The company, on the 29th of September, 1868, in due form, elected E. S. Brown an "agent for the transaction of the business of said company." The power of attorney to Brown recites the adoption of a by-law by the company, that all deeds and leases granting, conveying or leasing any real property of the company, shall be executed and acknowledged by the agent of said company, and by a majority of the board of directors in person or by proxy. and have the seal of the company impressed thereon; and the same shall not be binding on the company until so executed and acknowledged, and constitutes and appoints "the said E. S. Brown an agent for the transaction of the business of said company for the term of one year, subject, however, to the limitation and restriction contained in the said by-law, giving and granting unto the said agent all the power and

The St. Anthony Falls Water Power Company v. Eastman et al.

authority to transact the business of said company conferred by the said election, limited and restricted as aforesaid." *Held*, that Brown's authority as agent of the plaintiff was general, except in the execution of deeds and leases. In any question of Brown's agency, it was for the jury to determine whether, in the particular act or work involved, Brown in fact acted as the agent of the plaintiff; this question being determined affirmatively, if such act on his part was within the scope of his agency, as defined by the court, the plaintiff was bound by the acts of Brown, and therefore evidence of Brown's agreement with defendants, that a certain gate and bulkhead were suitable precautions in the construction of the tunnel, were admissible.

There was evidence tending to show that in the spring of 1869, after the agreement in this case was made, and after the tunnel had been commenced, but before it had reached the head of Hennepin Island, the plaintiff had excavated rock from the bed of the river along the shore of Nicollet Island, some distance from the line of the tunnel; that the accident happened when the tunnel had been excavated for some distance above the lower end of Nicollet Island; that the first appearance of water in the tunnel, where the first break occurred, was, as it were, a small spring; that the water gradually increased until it became a large stream; that the next morning, after the water in the tunnel began to increase in volume, a large break was discovered in the limestone rock forming the bed of the river, within the area from which the plaintiff had removed the rock; through this break the water was rushing in great volume and with great force into the tunnel. The defendants claiming upon the evidence that the plaintiff, by removing the rock from the bed of the river as aforesaid, had removed the support to waters of the river over what was probably a cavern in the sand rock with a channel running to the spring in the tunnel; *Held*, that it was a question of fact for the jury to determine whether the acts of plaintiff contributed directly to the injury; that the burden of proof upon the point was on the defendant; and that if there was evidence upon the question, which the court could not say was insufficient to sustain the verdict, the question was properly submitted to the jury.

In an action of this character, proof of contributory negligence of the plaintiff is admissible under a general denial in the answer.

Certain objections to the admissibility of evidence, which need not be mentioned in detail in a syllabus, considered and determined.

When an interrogatory embraces several questions, all of which are preliminary in their nature, and intended to elicit facts showing that the

witness was qualified by his professional knowledge and experience to testify as an expert in relation to matters embraced in his deposition, and the answer is a full response to the first branch of the interrogatory, and sufficient to entitle the witness to testify as an expert, but is defective as to the second branch of the interrogatory; still, if it is apparent from other answers of the witness in the same deposition that no practical injury could have resulted to the objecting party from the defective answer, and there is no reason to doubt that the interrogatory was properly put to the witness, nor any evidence of evasion on his part, or of any refusal or unwillingness to answer the same fully, and no step has been taken by such party previous to the trial to correct the deposition, although it was taken by him and was on file among the records in the case, the deposition will not be excluded.

The second cross-interrogatory was as follows: "If in answer to the fourth interrogatory above, you give any opinion as to the causes that led to the break and flow of water from the Mississippi River into the said tunnel, state fully and particularly *all* the grounds on which you base that opinion, and all your reasons for the same." The answer to this cross-interrogatory is as follows: "I have stated my reasons fully in answer to the direct interrogatory." *Held* that the answer is sufficient.

Although a question to a witness may not be strictly a cross-examination, if proper in other respects, its allowance by the court will not on appeal constitute ground for a new trial, when no injury resulted to appellant by reason of the order of the proof.

The order in which challenges to individual jurors in a civil action may be taken, is a matter the regulation of which is in the sound discretion of the court in which the trial takes place.

Appeal by plaintiff from an order of the district court for Hennepin county refusing a new trial. This was an action to recover damages for injury to certain lands and water power of the plaintiff through the alleged negligence of the defendants in the excavation of a tunnel at the Falls of St. Anthony, in the Mississippi River.

At this point the river is divided by two islands lying on the easterly side of the main channel, the lower belonging to the plaintiff and known as Hennepin Island, the upper known as Nicollet Island. The brink of the Falls is opposite the mid-

dle of Hennepin Island. These islands, as well as the banks and the bed of the river, consist of a ledge of limestone, in nearly horizontal strata, varying somewhat in quality, and divided by nearly vertical fissures into large angular masses. Beneath the limestone is a layer of clay or shale very impervious to water, resting on a bed of sand rock of unknown depth, composed of a great number of nearly horizontal strata, differing somewhat in hardness but not much in composition, and for the most part easily excavated with a pick. The limestone ledge in the bed of the river extends from the brink of the falls to a point about 450 feet above the lower end of Nicollet Island, known as " the Rips," above which the sand rock forms the bed of the river and the water is much deeper than upon the ledge. At the lower end of Hennepin Island the limestone is fifteen feet in thickness, in the river between the islands ten feet, at a point one hundred feet below the head of the ledge three feet, and at the head of the ledge from eight to twelve inches. The plaintiff had constructed a dam, resting upon the ledge, and extending from Main street, St. Anthony, on the easterly or left bank of the river past the head of Hennepin Island, and about two hundred feet into the main channel, and thence diagonally up the main channel to a pier in the centre of the stream, where it joined a similar dam extending from Minneapolis, on the west bank. Upon this dam, at the head of Hennepin Island, was a mill known as " Tuttle's Shingle Mill." As early as the year 1863, tunnels had been cut in the sand rock on the Minneapolis bank of the river, through which water was discharged from the water-wheels driving the mills. These tunnels were square in cross-section, were not lined or in any way protected. They had become considerably enlarged by abrasion of the water, but not so much so as to impair their efficiency or endanger their safety. In 1866 and 1867 a similar tunnel had been excavated by the plaintiff on

the east bank of the river. And in certain pamphlets intro-duced in evidence by the defendants at the trial marked Ex-hibits H, I and K, the two first of which were issued, and the latter widely circulated by the plaintiff, it appeared that the plaintiff was, in the years 1867 to 1869, contemplating an ex-tensive system of tunnels in the sand rock for the utilization of its water power. No such tunnel, however, had ever been attempted under the bed of the river.

By an agreement made the 20th May, 1867, the plaintiff granted to the defendant the right to draw from the Missis-sippi River in the deep water above the " rips" water suffi-cient to constitute a water power equal to two hundred horse power; the water so to be drawn to be used and discharged through a tunnel which the plaintiff granted to the defend-ants the right to construct from the point on Nicollet Island, where the water should be used, to the lower end of Henne-pin Island; the said tunnel to be constructed in the sandstone strata, and at such a level through its entire length as the plaintiff's agent should direct, but not so low as to prevent proper drainage; the tunnel to be constructed at the defend-ants' expense, and with all suitable precautions for the safety of the property, rights and interests of the plaintiff, which reserved the right to use the tunnel on or through Hennepin Island for venting water through it, on making such enlarge-ment as such use might render necessary, and paying there-after its just proportion of the expense of keeping the tunnel in repair below the highest point where the plaintiff should use it. The agreement further provided that the two hun-dred horse power of water should be used on turbine water wheels of the highest utility, to be placed in the tunnel or above the same in such a way as would most effectually util-ize the water.

The line of the tunnel was located on the 17th August,

The St. Anthony Falls Water Power Company v. Eastman et al.

1868, in the presence of the defendant, Eastman, and Mr. Chute, the then agent of the plaintiff    At the starting point, near the lower end of Hennepin Island, on the easterly side, the tunnel was forty feet below the surface, the ledge at that point being fifteen feet thick.   The tunnel was six feet square, and was intended to have a grade of three inches to the hundred feet, in order that the head of water might be forty feet; but there was conflicting evidence as to whether any specific instructions as to the grade were given by the plaintiff, and Chute, who testified that he limited the grade to three inches, also testified that this limitation was imposed in order that, by keeping the tunnel as low as possible, the greatest head possible might be obtained.   There was also some conflict of testimony as to whether a fall of three inches would be sufficient for a tail race of the length of the tunnel.

The excavation was begun on the 7th September, 1868. About three hundred feet from the mouth of the tunnel the dip of the strata increased near the line of the falls, the stratum in which the tunnel was excavated ascending faster than the grade, the result of which was that the progress of the work was impeded by a layer of boulders of a harder sand rock.   Accordingly the grade was increased, and thenceforward the excavation followed the dip of the strata, the roof of the tunnel being about seven feet below the bottom of the limestone ledge.   The effect of this was to give the tunnel a grade from station one to station thirteen, (thirteen hundred feet from the mouth,) of six 75-100 feet.   From the mouth of the tunnel to the upper end of the mill pond (so called) between the islands, a distance of seventeen hundred and fifty feet, the grade was twelve 79-100 feet, and in the mill pond the bottom of the tunnel was on an average twenty-three feet below the bed of the stream, the limestone at that place being ten feet thick, and the surface of the water having an el-

evation of forty-one feet above the bottom of the tunnel at station one, a point one hundred feet from the mouth.    About twelve hundred feet from the mouth of the tunnel a spring was met, sometimes a foot sometimes two feet wide and five or six inches deep, running along a boulder layer.    The tunnel followed this stream for twenty or thirty feet, leaving it on the easterly side, a ditch being made in the tunnel to carry off the water.    On the 19th May, 1869, as the tunnel was nearing the head of Hennepin Island, the plaintiff's directors notified the defendants in writing not to proceed with the construction of the tunnel further than Tuttle's shingle mill, (before mentioned,) until they should make all suitable precautions for the safety of the property, rights and interests of the plaintiff, as provided in the agreement.    Upon receipt of this notice the defendant, Eastman, had an interview with E. S. Brown, (who had succeeded Chute as the plaintiff's agent,) and with Mr. Cook, (an engineer who had been frequently employed by the plaintiff, and who had been engaged by the defendants to give lines and grades for the tunnel, but who did not have charge of the work.)    The result of this interview was that a bulkhead and gate, designed by Cook, were placed in the tunnel, under a shaft from the surface, at a point fourteen hundred and seventy-two 4-10 feet from its mouth, and about one hundred and twenty-five feet below the head of Hennepin Island, and the work proceeded.    From the mill-dam at the head of Hennepin Island to the foot of Nicollet Island is about two hundred and thirty feet.    The tunnel had been carried under this part of the river and to a point near the foot of Nicollet Island, when a second spring was encountered, at first smaller than that which had been met and passed under Hennepin Island.    The tunnel followed this spring thirty or forty feet and left it on the side toward the main channel.    After leaving the second spring the tunnel was

continued for six or seven days to a point about seventy feet above the foot of Nicollet Island until it was in all about nineteen hundred feet long.

The flow of water from the second spring rapidly increased, bringing with it at first dark coarse sand, and. afterwards leaves and chips. At length, in the forenoon of the 4th October, 1869, the water came into the tunnel in such volume that the workmen were driven out of it. The gate was closed, but this did not check the water which filled the tunnel from the upper spring to the mouth. The source of the water which thus filled the tunnel was not at first known; but on the following morning a mass of limestone about ten feet square fell down from the bed of the river at a point from eighty to one hundred feet below the head of the ledge, and about fifty feet from the shore of Nicollet Island. At the lower end of this break, the ledge was three feet thick. Afterwards the limestone from this point to the head of the ledge fell down over what was afterwards ascertained to be a well defined channel, from twenty to thirty feet wide, in the sand rock, beginning at the deep water above the head of the ledge at a point distant eighty feet from the westerly shore of Nicollet Island, and thence running obliquely to and under the first break to the spring in the tunnel. Through this channel the water rushed in great volume and with immense force into the tunnel, which was washed out through its entire length to a great width. A coffer dam was built around the break in the river bed, and the water shut off from the tunnel; but on the 29th October the limestone in the bed of the river between the islands, (at this point ten feet in thickness,) fell down into the tunnel, leaving a cavity sixty feet square through which the water again poured into the tunnel, washing it out to a still greater width, undermining a large part of Hennepin Island, destroying the plaintiff's property, and

threatening speedy destruction to the plaintiff's water power and to the falls themselves.

At the trial eminent engineers were, examined as experts, who concurred in testifying that the excavation of such a tunnel as that in question would be attended with great danger ; that such a tunnel should be oval, should be lined with the best brick, soaked and a second time burned, and laid in hydraulic cement, the interstices between the lining and the sandrock being filled with gravel and cement ; that the masonry should be surrounded with rings or flanges about two feet in thickness, not more than one hundred feet apart, and still nearer together as the tunnel advanced toward the head of water ; that the tunnel so constructed should be supplied with gates to be closed in case of an invasion of water. But the same witnesses agreed that such a tunnel so constructed could not be enlarged except by rebuilding it, and that the cost of such a tunnel would be so great as to render the undertaking, in a commercial point of view, impracticable

It appeared that Mr. Cook, an engineer who resided at Minneapolis, and who had been frequently consulted and employed by the plaintiff in the development of its water power, was employed merely to give lines and grades for the tunnel, the undertaking being directed and controlled by the defendant Eastman, who was not a professional engineer, but had many years experience in the building of mills, and putting in flumes and wheels, and who had excavated the first tunnel constructed at Minneapolis. Mr. Cook testified that, from an extensive examination of the sandstone layers prior to the excavation of this tunnel, he had been led to the conclusion that there were no faults or pockets in it, and up to that time he had never been able to discover more than one spring or stream of water issuing out of the sandstone ; that the precautions he recommended were to wall up three hundred feet

at the mouth of the tunnel with masonry, before using it, to protect the spring on Hennepin Island, and the gate where the line of the tunnel made an angle; that it was his judgment at that time that there was no reason why the tunnel should not stand, aside from frost and abrasion.

Upon several matters of fact the evidence at the trial was conflicting. The testimony of defendants' witnesses tended to prove that Brown, the agent of the company, assented to and approved the plan of bulkhead and gate, shown by Cook to him and the defendant Eastman, as a sufficient compliance with the plaintiff's requirement that defendants should take suitable precautions for the protection of its property; while the testimony of the plaintiff's witnesses was to the effect that Brown declined to take the responsibility of determining what precautions would be suitable, and referred the defendants to the plaintiff's directors, with whom the defendant Eastman afterwards conferred in regard to the notice served upon him, the inference being that he did not rely on Brown's opinion or consider it binding on the plaintiff.

In the spring of 1869, after the tunnel was begun, the plaintiff's wing dam having been carried away, the plaintiff built a a temporary dam from Nicollet Island to the pier in the centre of the river at the head of the ledge. This dam was in part composed of cribs filled with stone, and the defendants introduced evidence tending to prove that part of this stone was obtained by the plaintiff by quarrying the limestone ledge in the bed of the river at the point where the first break occurred, thereby contributing to the injury for which the action was brought. On the other hand the plaintiff's witnesses testified that the stone for the cribs was not quarried at the place of the break, but at some distance nearer the shore.

The pleadings and most of the exceptions taken at the trial are stated at large in the opinion. The following instructions
VOL. XX.—37

excepted to by the plaintiff are there referred to but not fully stated.

The thirteenth instruction requested by the plaintiff was to the effect that if Brown, the plaintiff's agent, when asked by the defendant, Eastman, what precautions were demanded by the plaintiff, declined to assume the responsibility of determining, then Brown's subsequent expression of opinion that certain plans shown to him would be sufficient could only be regarded as his individual opinion, not binding on the company. The court, however, qualified this instruction by leaving it to the jury to determine these questions, as well as whether Brown was acting in the business of the company or on his own responsibility ; instructing them that if acting for the company his admissions would bind the plaintiff if made within the scope of his authority, with reference to the subject-matter in which he was engaged, and while he was so engaged

The plaintiff's fourteenth request was to the effect that if the defendant Eastman after the conference with Brown and Cook went to the plaintiff's office, and at his own request had a conference with the plaintiff's directors as to the precautions to be taken, this is evidence showing that he did not rely on Brown's acts or opinions, or consider them binding on the plaintiff; but the court left it to the jury to determine the effect of the facts assumed in connection with the other facts in the case bearing on the same point.

In response to the requests of the defendants, numbered six, seven, and seven and one-half, the court instructed the jury in substance, that if, after the plaintiff demanded of the defendants to take the precautions required by the contract, it was agreed between the parties that a bulkhead and gate, constructed upon a plan then agreed upon, would be the " suitable precautions " required by the contract, and thereupon the defendants constructed such bulkhead and gate, at

The St. Anthony Falls Water Power Company v. Eastman et al.

the point and according to the plan so agreed upon, and then continued the excavation in the same manner and with as much precaution as before, these circumstances are proper to be considered by the jury upon the question, whether the defendants used the " suitable precautions " required by the contract; that it was a fact for the jury to find, whether Brown was acting for the plaintiff or on his own responsibility; that if he was acting for the plaintiff, then his acts within the scope of his authority were the acts of the plaintiff; that Brown's acts while agent for the plaintiff in any matter pertaining to their business (with the exceptions stated in his power of attorney from the plaintiff) bound the plaintiff.

The defendant's requests, numbered respectively eight, nine ten, eleven, twelve and thirteen were to the effect, that if after the execution of the contract the plaintiff quarried rock in the bed of the river at the point where the water first broke through the ledge, and by such quarrying, or in any other manner, contributed to the injury, the plaintiff cannot recover. In answer to these requests, the court repeated substantially the instruction already given in response to the plaintiff's eighteenth request, and which is stated in the opinion.

After the jury had been called, the defendants challenged one juror peremptorily, and another was called in his place. The defendants then stated that they " do not challenge any other juror at present," claiming that the peremptory challenges should be made by the parties alternately. A juror was then challenged peremptorily by the plaintiff, and another called in his place. W. A. Jackson was then challenged peremptorily by defendants, to which challenge the plaintiff objected on the ground that the right so to challenge was waived by the defendants. The objection was overruled and the plaintiff excepted.

The jury found a verdict for the defendants.

LOCHREN & McNAIR and J. B. GILFILLAN, for Appellant.

JAMES GILFILLAN and D. A. SECOMBE, for Respondents.

*By the Court.*—McMILLAN, CH. J.—The complaint avers the incorporation of the plaintiff in 1856, and that on the 20th of May, 1867, and for a long time prior thereto, it was, ever since has been, and still is the owner of certain lands, including Hennepin Island, water power, mills and other property connected therewith at the Falls of St. Anthony, of great value, to-wit: six hundred thousand dollars; that on said 20th day of May, 1867, the plaintiff and defendants made and entered into a certain agreement, touching, among other things, the construction by defendants of a certain tunnel therein described, of which agreement a copy is annexed to and made part of the complaint. The complaint further alleges the digging of the tunnel by defendants, and that it was constructed without any suitable precautions, and so unskilfully, that, through such neglect and unskilfulness, in the month of October, 1869, the waters of the Mississippi river broke and ran with great violence into and through said tunnel, and rent, tore, washed and carried away the soil and material, which had theretofore underlain and supported the ledge of rocks forming the bed of said river at said Falls, and the soil and material composing said Hennepin Island and the lands adjacent thereto, the property of the plaintiff, whereby the said property of the plaintiff, and specially the said water power and improvements, were greatly injured and damaged, were being rapidly undermined, and were put in imminent danger of speedy and total destruction. That afterwards, and when the said property of the plaintiff was in imminent danger of

being so speedily destroyed, the defendants utterly and wantonly abandoned said tunnel and the construction thereof, and left the same in the condition and working the destruction aforesaid, and refused, and have ever since refused to take any action for the preservation or safety of the property, rights or interests of the plaintiff, so imperilled as aforesaid, though often requested by the plaintiff so to do. That the plaintiff expended large sums of money in staying the torrent and saving their property, and were hindered for a long time from using their mills, and in all suffered damage amounting to $250,000.

The agreement referred to and made part of the complaint, dated the 20th day of May, 1867, provides among other things as follows: "The parties of, the first part," (this plaintiff) " concede" to the parties of the second part, (these defendants,) " the right to draw from the Mississippi river on the west side of the certain island in said river, at and above the Falls of St. Anthony, * * commonly known as and called Nicollet Island, below the suspension bridge, so called, and in the deep water above the ledge of rocks in said river commonly called the 'rips,' and to use on the said island below the said bridge, in the manner and in accordance with the specifications, limitations and provisions hereinafter contained, and not otherwise, a quantity of water sufficient to constitute a water power equal to two hundred (200) horse power; provided, and it is hereby expressly understood between the parties hereto, that such water or water power shall not, nor shall any part of it, ever be used for the sawing or manufacture of lumber from logs; * * * and in order that said water may be made available to said parties of the second part, the said party of the first part doth hereby give and grant unto the said parties of the second part, their heirs and assigns, the right to construct, maintain and use, in the manner

hereinafter provided, a tunnel from said Nicollet Island, through the island below said Nicollet Island, commonly. called Hennepin Island; all of the water, so to be drawn as aforesaid, shall be used and discharged through the said tunnel, which shall extend from the point on said Nicollet Island, where said water shall be used, to and through said Hennepin Island to the lower end of the east side of the said Hennepin. Island, at the lower side of land leased by said party of the first part to Erb & Kassube, on which their grist mill is now situated.          *          *          *          *          *          *          *          *          *

" The said tunnel          *          *          is to be constructed in the sandstone strata under said Hennepin Island, and on such a level through its entire length as the agent of the said party of the first part may direct, but not so low as to prevent proper drainage; it shall be constructed at the expense of the said parties of the second part, and with all suitable precautions for its safety, and the safety of the property, rights and interests of the party of the first part; said parties of the second part shall have the right to bore or shaft down through said Hennepin Island, to and into said tunnel for all necessary purposes of access and ventilation. And the said party of the first part hereby reserves to itself, its successors and assigns, the right at any time to use the said tunnel on or through said Hennepin Island, for venting water through it, upon making such enlargement thereof as may be necessary to vent the additional water, which said party of the first part, its successors or assigns, may turn into it. And in case of such use by the party of the first part, its successors or assigns, they, the said party of the first part, its successors or assigns, shall bear and pay thereafter their just proportion of the expense of keeping said tunnel in repair below the highest point, where the same shall be used by said party of the first part, its successors or assigns."          *          *          *          The answer of the de-

fendants puts in issue each and every allegation in the complaint.

The trial continued for about four weeks, and resulted in a verdict for defendants. A motion for a new trial having been denied, the plaintiff appealed from the order denying such motion to this court.

The exceptions taken upon the trial are very numerous. The right to construct the tunnel having been expressly granted by the plaintiff to the defendants by the agreement between them, and the injury complained of having been occasioned to the plaintiff by the construction of such tunnel, in order to render the defendants liable for the injury the plaintiff must show that the act or work, occasioning the injury, is a violation by the defendants of the terms of the agreement. This must be shown by proof that the injury was caused through the carelessness or neglect of the defendants in the construction of the tunnel, unless, as the plaintiff claims, the agreement upon the part of the defendants is an absolute guaranty against injury to the plaintiff by the construction of the work, in which case proof of the injury is all that is required. A construction of the agreement is necessary, therefore, in order to determine the rights and liabilities of the parties, and will dispose of many of the exceptions taken upon the trial.

The plaintiff insisted on the trial below, and here insists, that the stipulation in the agreement that the tunnel should be constructed " with all suitable precautions for its safety, and for the safety of the property, rights and interests of the " plaintiff, cast upon the defendants the risk of the enterprise, and the duty, if they should enter on its execution, of using and employing *adequate* means for the protection of such property, rights and interests of the plaintiff from danger by reason of such construction, and was an absolute guaranty

by the defendants against all injury that might occur to the property of the plaintiff by reason of the construction of the tunnel. This, we think, is not the fair construction of the instrument. The word "precautions," as used in the contract, means cautionary measures, taken in the construction of the tunnel before the occurrence of injury by reason of such construction, to prevent such injury. The ordinary and general signification of "suitable" is "likely to suit," "capable of suiting," "adapted." This is by no means equivalent to "adequate." That which is adequate must be suitable, but that which is suitable may not be adequate. What precautions are suitable for a particular purpose is a matter of judgment, and the best judgment may be erroneous, or the cautionary measures suggested by it may for other reasons prove to be ineffectual for the purposes for which they were designed; therefore "all suitable precautions," may not be adequate to prevent the injury. We are therefore of opinion, that upon a fair construction of the language of the agreement, it cannot be considered an absolute guaranty.

Again, the plaintiff reserves to itself a right in the tunnel i. e. to use it on Hennepin Island for venting water through it, upon making such enlargement thereof as may be necessary to vent such additional water. Further, the defendants have not the unlimited control of the manner of constructing the tunnel, the plaintiff reserving the right to direct by its agent the level of the tunnel through its entire length, limited by the provision that it shall not be so low as to prevent proper drainage. The defendant well argues that a provision in a contract between two parties, by which one of them assumes all the risk of an enterprise, the advantages of which are to be shared by both, is not an ordinary one; and we add, it is quite as unusual in an agreement between two parties, for one of them to guaranty the other against all injury from an

undertaking, of which he has not absolute control, but in which both participate. Looking, then, to the other portions of the agreement, we are led to the same construction of the clause under consideration, which we have given to the language of the stipulation itself, and if, in addition to this, we invoke the rule applicable to a deed like the one under consideration, granting a right and imposing conditions thereon, that the words of the instrument are to be construed more strongly against the grantor than the grantee, it confirms the conclusion that the stipulation is not a guaranty.

If, then, the stipulation does not amount to a guaranty, what is its true construction ? That the court must construe the contract and determine its legal effect, when the contract is in writing and its terms are unambiguous, is a familiar rule. But the contract is to be construed in the light of surrounding circumstances and the situation of the parties at the time of entering into the contract, and parol proof of these facts is admissible, both for the purpose of raising and explaining a latent ambiguity. 2 *Chitty on Contracts,* (11 *Am. ed.*) 149. The kind of tunnel to be constructed is not expressed in the contract under consideration. Evidence as to the situation of the parties and existing circumstances, among them the fact that there was then, and had been for some time, in use at that place a system of tunnelling for hydraulic purposes, without lining, through the sandstone stratum, was admissible in order to determine whether the parties intended by their contract a tunnel in the sandrock without lining of masonry work. For, the contract being silent as to the kind of tunnel, it might fairly be presumed they intended that in most common use at the time and place, unless such presumption tends to defeat some express provision of the contract. " If parties enter into a contract, by virtue whereof something is to be done by one or both, and this thing is often done in their neighbor-

hood, or by persons of like occupations with themselves, and is always done in a certain way, it must be supposed that they intended it should be done in that way." 2 *Pars. on Cont.* 537.

Evidence of this character being admissible, the construction of the contract as to the kind of tunnel intended by the parties, was a mixed question of law and fact, the question as to what facts were to be considered by the jury in arriving at the intention of the parties being one of law for the court, the existence of such facts being a question solely for the jury. The words, " all suitable precautions," have reference to the kind of tunnel to be constructed, and mean all such suitable precautions as a discreet, prudent and cautious man of ordinary capacity would adopt in the construction of such a tunnel, were the risk all his own, under the facts and circumstances as then and there known and understood, and which, by the use of reasonable diligence, caution and skill, might have been known or anticipated. Within this limitation it was for the jury to determine what particular acts or measures of precaution were suitable and incumbent on the defendants for the safety of the tunnel and the rights and property of the plaintiff. This referred to the jury the like necessity for determining questions as to the employment of a civil engineer, the sufficiency of the engineering skill employed, and the necessity for lining the tunnel, or any portion of it, with masonry work, together with all similar questions.

The effect of the rules thus laid down as to the construction of the agreement is, that if the jury should find, as under the instructions of the court they may have done, that the tunnel·intended by the contract was an unlined tunnel in the sandstone stratum, the omission to line the tunnel would not of itself, in case of injury to the tunnel, be negligence; but that, in order to render the defendant liable for negligence, it must appear that the omission to line the tunnel was a

neglect to use one of the suitable precautions required by the agreement within the rule above laid down.

The instructions given by the court below to the jury of its own motion, and those given by it in response to the first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, eleventh and fifteenth requests submitted by the plaintiff, and the first, second, third, fourth and fifth requests submitted by the defendants, are in accordance with the views we have expressed. The exceptions of the plaintiff to such instructions, and to the refusal and modification of such of the requests as were refused or modified by the court, are not sustained.

The plaintiff, by its tenth request, asked the court to charge the jury that " the plaintiff had the right, under the agreement, to fix the grade on which the tunnel should be excavated for its entire length ; and if the jury believe that the plaintiff did fix that grade at three inches to the hundred feet as the limit, and that the defendant disregarded said grade, and, for the purpose of excavating a softer stratum, did rise a considerable number of feet from the grade so fixed, and that such a rise of grade was the cause of their meeting with the water, which they would not have met with had they kept in a harder stratum below, where plaintiff had fixed the grade, then defendants are liable on account of any damages which resulted from such change of grade by them." The court so charged, but at the same time directed the jury " to consider the evidence and the terms of the contract, in connection with the request so given ; that the plaintiff had no right to make the grade so nearly level as to prevent proper drainage, nor so as to cause water to flow back on the wheels ; that the contract was to be considered as a whole, and they should consider the amount of water which might be used and vented under it, and the provisions in reference

to water wheels and utilization of power." To which charge, beyond the terms of the request, the plaintiff duly excepted.

There was evidence tending to show that the grade for a tail-race should not be less than one inch in twenty feet, and that in such a tunnel the grade ought to be seven or eight inches to the hundred feet. The plaintiff had the right, under the agreement, to direct the level of the tunnel throughout its entire length, but could not make it so low as to prevent proper drainage, or cause the water to flow back upon the wheels, which were intended to be driven by the water passing through the tunnel.

It is expressly stated in the agreement that " all of the water," (viz., water sufficient to construct a water-power equal to two hundred horse power,) " is to be used and discharged through said tunnel ;" and that " the said two hundred horse power of water is to be used on turbine wheels of the highest utility, to be placed in the said tunnel or above the same, in such way as will most effectually utilize the water, so that the said two hundred horse power may be obtained from the least quantity of water." It was entirely proper for the court, in charging the jury as requested by the plaintiff, to direct them, in connection therewith, to the limitation of the power of the plaintiff and to all the provisions of the contract affecting it. We see no error in the direction given of which the plaintiff can complain.

The plaintiff's twelfth request was as follows : " That it was no part of the business of the plaintiff to decide on the question of what would or would not be suitable precautions to be taken in constructing such a tunnel, and therefore E. S. Brown, as the agent of the plaintiff, had no authority to determine, prescribe or agree, in advance of measures of precaution being taken, whether they would be suitable or adequate or not, so as to bind the plaintiff." The court refused

to so charge without modification, to which refusal the plaintiff duly excepted.  But the court modified said request by substituting for the words " had no authority," the words, " was not required," and charged the same as so modified. To which modification and substitution the plaintiff duly excepted.

There is evidence tending to show that, as the defendants, in the construction of the tunnel, were approaching the head of Hennepin Island, E. S. Brown, agent of the plaintiff, in pursuance of a resolution of the plaintiff directing him so to do, served upon defendants a written notice, notifying the defendants " not to progress with the construction of the tunnel now being made by them further up than Tuttle's shingle mill, so called, until they, the said Eastman and Merriam, shall make all suitable precautions for the safety of the property, rights and interests" of the plaintiff.  At the time this notice was served, the defendants had been at work about eight months, and had dug about one thousand feet of the tunnel without lining it, or proposing to line it, and no complaint had been made by plaintiff, and no other objection or notice had been made or given in relation to the work.

On the reception of this notice the defendant Eastman met, and had a consultation with Mr. Brown, and Mr. Cook, who was engaged in engineering for both parties, as to what precautions would be necessary and satisfactory to the plaintiff.  It was agreed that, as such precautions, defendants should put in, at a point designated, a bulkhead and gate, pursuant to a plan drawn by Cook, and agreed on between Eastman and Brown.  Defendants put in the bulkhead and gate and proceeded with the tunnel.

By section five of the plaintiff's charter, (*Laws* 1856, *p.* 215,) it is authorized, by vote of a majority of the stockholders, to elect for a term of one or more years, " an agent or

agents for the transaction of the business of said company, who shall reside within this territory and have such power and authority to transact the business of said company as the said company by vote as aforesaid shall delegate and authorize; and no agent elected as aforesaid shall enter upon the duties of his office, or transact any business in behalf of or for the the said company, until the president and directors thereof shall make and execute a power of attorney in due form, and acknowledge the same before an officer empowered to take acknowledgments of deeds, which power of attorney shall clearly and specifically set forth what business, and to what extent the said agent or agents are authorized to transact business in behalf of said company, unless the power of attorney aforesaid be general, in which case the said company shall be bound by the acts of said agent to whatever extent the said agent assumes to act." The company on the 29th of September, 1868, in due form elected E. S. Brown an " agent for the transaction of the business of said company." The power of attorney to Brown recites the adoption of a by-law by the company that " all deeds and leases, granting, conveying or leasing any real property of the company, shall be executed and acknowledged by the agent of said company and by a majority of the board of directors, in person or by proxy, and have the seal of the company impressed thereon; and the same shall not be binding on the company until so executed and acknowledged," and constitutes and appoints " the said E. S. Brown an agent for the transaction of the business of said company for the said term of one year, subject, however, to the limitation and restriction contained in the said by-law, giving and granting unto the said agent all the power and authority to transact the business of said company conferred by the said election, limited and restricted as aforesaid." Under these proceedings and this power of attorney Brown's

authority as agent of the plaintiff was general, with the exception of the qualification as to the execution of deeds and leases. The transactions under consideration transpired during the existence of this agency.

It was not, of course, the duty of the plaintiff, under this contract, to determine what would or would not be suitable precautions in the construction of this tunnel; but there is certainly nothing to prevent the parties from agreeing upon what precautions shall be considered suitable, and a compliance with the contract. The plaintiff has expressly reserved to itself the right, by its agent, to direct the level of the tunnel through its entire length; and had the right, not only for this purpose but generally, to watch the progress of the work, and, if at any time it deemed the precautions unsuitable, to agree with the defendants as to what would be suitable, and to take measures for its protection against danger or injury threatened by reason of any neglect upon the part of the defendants to comply with the agreement. The same thing was within the authority of Brown, as the general agent of the plaintiff, and in addition to this, the plaintiff, by its resolution directing him to notify the defendant, had charged him with this business. In any question of his agency, it was, of course for the jury to determine whether in the particular act or work involved, Brown, in fact, acted as the agent of the plaintiff; this being determined affirmatively, if such action on his part was within the scope of his agency as defined by the court, the plaintiff would be bound by the act of Brown. The court, therefore, was right in refusing to charge in accordance with the plaintiff's twelfth request, and in charging the same as modified by the court. The court was right also in refusing to charge the thirteenth and fourteenth requests, as submitted by plaintiff, and in modifying and qualifying them as it did, in the instructions given

in response to such requests, and in the instructions given to the jury upon the points numbered six, seven, and seven and a half, submitted by the defendants, to which the plaintiff excepted.

The sixteenth, seventeenth, and eighteenth requests submitted by the plaintiff, and the eighth, ninth, tenth, eleventh, twelfth and thirteenth requests for instructions, submitted by the defendants, relate to the question of contributory negligence by the plaintiff, in excavating rock from the bed of the river along the shore of Nicollet Island, including the place at which the first break in the limestone rock occurred, through which the water poured into the tunnel. The plaintiff's sixteenth request was correctly refused by the court. The excavation of the rock took place in the spring of 1869, after the contract involved in this case was entered into, and after the tunnel had been commenced, but before the excavation had reached the head of Hennepin Island. If this contributed directly to the injury, and the defendants were aware that it did so, they were required to use ordinary care to avoid its effect. The request submitted, however, expressly assumes that the defendants knew of the excavation to its fullest extent, and assumes also, by implication at least, that they knew, or by the exercise of ordinary diligence might have known, in time to guard against its danger, that the excavation increased the risk to the tunnel, all of which were questions of fact for the jury, and as to the latter, at least there was great doubt. The request also, upon these assumed facts, imposes upon the defendants the unqualified duty of guarding against the danger. The instruction requested was erroneous, both in its assumption of facts and in the extent of the obligation it imposed upon the defendants.

The seventeenth request of plaintiff assumes, as established,

facts which were disputed, and the determination of which was for the jury, and was properly so left by the court.

The plaintiff's eighteenth request is as follows: "That the jury are to lay out of the case all questions of contributory negligence, growing out of the excavation of rock by plaintiff on the side of Nicollet Island." The court did so charge, but with this qualification: "Unless the acts of the plaintiff were of a character directly calculated to endanger the tunnel without due care and precaution, having reference to the condition of the river and the state of things under which defendants were digging the tunnel; that upon this subject the burden of proof rested upon defendants." To this charge the plaintiff excepted.

The only ground upon which the plaintiff can object to this instruction is, that there was not sufficient evidence in the case upon this question of its contributory negligence to submit it to the jury. There was some evidence upon the question, and we are not able to say·that there was such a want of evidence upon this point as to render the instruction erroneous. These views substantially determine adversely to the plaintiff the points involved in the instructions given by the court, in answer to the eighth, tenth, eleventh, twelfth and thirteenth requests of the defendants, to which the plaintiff excepted.

Having thus settled the construction of the written agreement and the rights of the parties thereunder, we are prepared to consider the questions raised upon the exceptions by the plaintiff to the admission of evidence upon the trial below. The exhibits Q, H, I and K, were all proper evidence. The witness, S. H. Chute, a director of the plaintiff, testifies that plaintiff kept in its office for circulation a large number of copies of exhibit K, and distributed them with the circular, (exhibit H,) and lithograph, (exhibit Q.) The exhibits Q, H and

I were compiled and circulated by the company. These documents tend to show that, at and before the making of the contract involved in this case, the mode of constructing tunnels at and in the vicinity of the Falls of St. Anthony was the same as that adopted by the defendants in constructing the tunnel in question, and that it was regarded by the plaintiff as a prudent and suitable one. The testimony of certain of the witnesses for the plaintiff as to the value of the property was based in part on the proposed development of the plans for its improvement. These exhibits show such plans, and for that reason were admissible. The testimony of the witness Chute in regard to these was also competent and material. The questions to the witness Cook, relating to his employment by the plaintiff .and the purpose for which he was employed by it, were competent as relating to the acts of the plaintiff, tending to show that it had, or was maturing, a general plan, (including the tunnel in question and others like it,) for the improvement of its .water power, and also tending to show that the mode in which the tunnel in question was constructed was not an improper mode. If the examination was calculated and intended to show that the plaintiff knew and assented to the manner in which the tunnel was being constructed, we are unable to see why it was not competent, as showing the construction of the agreement by the acts of the parties.

The question put to Cook upon his cross-examination, and as a witness in chief for defendants, and to McCartney and Eastman on their examination in chief, in reference to the excavation and removal of rock from the bed of the river at the shore of Nicollet Island, including the place where the first break in the lime rock occurred, were not erroneous. We have already virtually determined this point in considering the instructions of the court to the jury upon the ques-

tion of this excavation.    In order to prove contributory negligence of the plaintiff in a case like the present, it is not necessary to plead it specially; proof of it is admissible under a general denial in the answer.

Having already determined that the question as to what were suitable precautions in the construction of the tunnel, was a question of fact for the jury, it was competent for the defendants to show what precautions had been taken by them, and if the plaintiff had advised certain steps as suitable precautions, or consented to the same as such, evidence thereof was competent for the purpose of showing an admission by the plaintiff that such precautions were suitable, and disproving negligence upon the part of the defendants.   The authority of Brown, as agent for the plaintiff, being general, except as to the execution of deeds and leases, his acts, within the scope of his authority, were binding upon the plaintiff.   The qualification of his power as agent, is, by the by-laws of the company, confined to the execution of deeds and leases; this in no wise affects his power as agent to negotiate in relation to rights and interests of the plaintiff which may be the subject of deeds, in which, under the by-laws, others therein mentioned are required to join with him, and admissions made by him, in the course of such negotiations, against the interest of the plaintiff, affect the plaintiff as if they had been made by any other agent or agents of the company. The questions to Cook relative to conversations with Eastman and Brown about the bulkhead, and the questions to Brown in reference to his negotiations with the paper mill company for a change of location, and the evidence of Eastman as to conversations with Brown about bulkheads, were not erroneous.

The witness Richard Chute having stated his opinion that one inch in a hundred feet was a proper grade for the tunnel,

it was proper for the defendants to show, upon his cross-examination, that this referred to a tunnel constructed in the sand rock without lining. The questions put to him on that subject were proper.

The plaintiff, upon its case in chief, called Sumner W. Farnham as a witness, and addressed to him certain questions as to whether the defendant Eastman came to him to consult him, as a director and member of the Water Power Company, as to what precautions should be used in the construction of the tunnel, and whether he came to see and consult with the directors of the company on that subject. The questions were objected to by the defendants, as incompetent, immaterial and irrelevant, and the objections were sustained by the court. These questions, upon their face, call for testimony which was not competent, as evidence in chief for the plaintiff, and no special purpose was indicated by the plaintiff. At this time there was no conflict of testimony, and afterwards, when there was testimony upon both sides, the witness Farnham was called by the plaintiff, and his testimony upon the subject of Eastman's interview with him and the directors of the company was received in rebuttal. We are of opinion that the court properly rejected the testimony in the first instance ; but if there was any error therein, it was cured by the subsequent reception of the testimony of the same witness upon the subject.

The exclusion of the testimony of S. H. Chute as to how much the plaintiff paid James B. Francis for services in examining the tunnel with reference to its repairs, whether properly admissible or not, is not ground for a new trial. The testimony could only affect the case upon the question of damages, and, as the jury did not reach the question of damages, no injury could have resulted to the plaintiff by the ruling of the court upon the subject.

The St. Anthony Falls Water Power Company v. Eastman et al.

The defendants offered in evidence the deposition of James B. Francis, which had been taken in the cause on the part of the *plaintiff*, and was on file among the records of the case. The plaintiff objected to the introduction of the deposition, and all of the same, upon the grounds that the last question of the second interrogatory is not answered at all, and that the second cross-interrogatory is not properly answered, but merely refers to a previous answer, and assumes it to be answered in such previous answer. The objections were severally overruled and the plaintiff excepted to the ruling. The second interrogatory is as follows: "What is your occupation or profession, and how long and how extensively have you been engaged in such occupation or profession? If you answer that you are an engineer, state what opportunities you have had for observing the effects of water and the pressure of water upon different kinds of soil, earth and rock, and the extent and character of your experience in regard to the effect of water on such materials." The answer of the witness to the interrogatory is as follows: "I am a hydraulic engineer and have been actively engaged in it at Lowell and elsewhere during the last thirty-six years." All the questions in this interrogatory are preliminary in their nature, and intended to elicit facts showing that the witness was qualified, by his professional knowledge and experience, to testify as an expert in relation to matters embraced in his deposition, in order that his testimony might be admissible and have influence with the jury. The answer given to the interrogatory is sufficient to entitle the witness to testify as an expert in relation to the construction of the tunnel, so far as his testimony in regard to it was received. It is certainly a full response to the first question embraced in the interrogatory, and if it is not so explicitly responsive to the second branch of the interrogatory as strict practice would require, still we are of

opinion that no practical injury could have resulted to the plaintiff, when it is considered that the witness subsequently testified that the only experience he knew of in tunnelling for hydraulic purposes, in the kind of sand rock through which the tunnel was cut, had been at the Falls of St. Anthony, and that he had had no experience in such tunnelling except what he acquired in connection with his examination there in May and June last. And in his answer to the fourth interrogatory he details the results of his observations at that time. There is no reason to doubt that the interrogatory was properly put to the witness, nor is there any evidence of evasion on his part, or of any refusal or unwillingness to answer the interrogatory fully. The deposition was taken by the plaintiff and was on file among the records of the case; yet the plaintiff, previous to the trial, took no step to suppress the deposition, or have the defective answer corrected by a re-execution of the commission. Under all the circumstances, we are of opinion that the deposition was properly received. See *Baker vs. Spencer*, 47 *N. Y.* 562.

The answer to the second cross-interrogatory is sufficient.

The objections taken upon the trial to specific portions of the deposition of Francis are referred to in the appellant's brief, but so generally that we do not feel called upon to consider them in detail. If there was any error in admitting such portions of the deposition as were permitted to go to the jury, it was not such error as would authorize a new trial.

The plaintiff objects that the court erred in allowing the testimony of Eastman, relative to attempts at settlement, and offers at settlement, by plaintiff and its directors, referring to certain folios of the case. Upon reference to the folios, it seems to us that, whatever may have been indicated by the questions put to the witness Eastman, the testimony given in

response to them relates only to certain offers made by the defendants to the plaintiff in regard to repairing and protecting the tunnel. While we do not deem the testimony important, it was admissible in answer to the testimony of S. H. Chute, a witness for the plaintiff, who says, that in December, subsequent to the breaking of the tunnel, a certain notice, which is in evidence, was served by the Water Power Company upon the Tunnel Company, notifying the latter to take suitable measures to protect the property of plaintiff from further damage by reason of the tunnel, to which no favorable response was given by the defendants. There was no attempt to prove any offer of compromise made by the plaintiff, so far as we can discover.

The question put to the witness Lane, in reference to the bulkhead and gate in the tunnel, "What were Eastman's instructions?" we think was not proper. But as the testimony showed without contradiction that the work was actually done according to the instructions stated by the witness, proof of what the instructions were, could not in any way prejudice the plaintiff, and, therefore, we think is not ground for a new trial.

Several of the items of testimony and questions put to witnesses were objected to by the plaintiff on the ground that they were not proper as a cross-examination of the witnesses. This objection we have not thus far specifically noticed, and we remark, generally, that we are unable to perceive in any of the instances to which we refer, that any injury resulted to the plaintiff, by reason of the order of the proof, and under such circumstances, although a question may not be strictly a cross-examination, if proper in other respects, its allowance in the court below will not constitute sufficient ground for a new trial. We also remark, generally, that among the items of evidence received upon the trial, to the reception of which

the plaintiff excepted, there may be some of such minor importance that, although under the application of strict rules of law, they might have been excluded, their reception could have worked no injury to the plaintiff, and therefore was not ground for new trial.

The plaintiff further objects that the verdict is not justified by, and is contrary to, the evidence. The rule is settled, in this state, that a verdict will not be set aside upon appeal to this court in any case where there is evidence reasonably tending to support it. (*Hinkle v. L. S. & M. R. R. Co.* 18 *Minn.* 297.)

In view of the construction given to the contract between the parties, we think, so far as relates to the question whether suitable precautions were taken by the defendants in the construction of the tunnel, the case is clearly within the rule just mentioned. Upon the question of contributory negligence by the plaintiff, we are not entirely free from doubt as to whether the evidence is sufficient to sustain the verdict, and it is after some hesitation we have arrived at the conclusion to sustain the verdict against the objection    *Morris v. St. P. & Chicago Railway*, MS. April Term, 1874.

The statute regulating the trial of civil actions by jury in the district court provides as follows : " Either party may challenge the jurors ; but when there are several parties on either side they shall join in a challenge before it can be made ; the challenges are to the panel and to individual jurors, as in criminal actions, except that there can be but two peremptory challenges on each side." *Gen. Stat. chap.* 66, *sec.* 208.   Whatever may be the effect of the language, " the challenges are to the panel and to individual jurors, as in criminal actions," it could have no effect as to the *order* in which peremptory challenges to individual jurors are to be taken, for at the adoption of this section the statute regulating chal-

lenges to jurors in criminal cases expressly restricted the right of peremptory challenge to the defendant. *Gen. Stat. chap.* 116, *sec.* 13. The statute contains no other provision, that we are aware of, affecting this question. The order, therefore, in which peremptory challenges to individual jurors in a civil action may be taken, is a matter the regulation of which is in the sound discretion of the court in which the trial takes place. There is nothing in this case tending to show that the discretion of the court was not properly exercised. The objection that the court erred in allowing the defendants' peremptory challenge to the juror W. A. Jackson, is not well taken.

This disposes of all the points raised by the appellant.

The order denying a new trial is affirmed.

Mr. Justice Young took no part in the consideration or decision of this case, the cause having been submitted before he took his seat upon the bench.